v. Hidden Village LLC James Clymer It is this. No member of a protected class was ever denied the availability of housing. The evidence in this case indicates that not one member of the youth reentry program that was run by Lutheran Metropolitan Ministries left Hidden Village's premises. In fact, the LMM population, or number of LMM clients in Hidden Village, increased over the years. Any fluctuations downward were caused by LMM's own funding capabilities. There is no dispute about that fact in this case. That said, the issue before this Court, I would submit, is whether or not there is a need to show a violation of 42 U.S.C. 3602 as a predicate to bringing a claim for retaliation under 42 U.S.C. section 3617, which is the claim before us here, or one of the five claims before us here. At the time of the events at issue in this case, at least two circuits and two district courts indicated that there did need to be a predicate violation. There were a number of district courts that held otherwise. One of those circuits has now, quite frankly, rethought its view on that matter. I would suggest that, in fact, there is good reason to require a predicate violation of one of the underlying substantive claims in order to bring a retaliation claim. And why is that? First of all, a nexus between the underlying claims, 3604 and the other claims from 3603 to 3607, it at least advances the purpose of the Act, which is to ensure that housing is available free of discrimination. To not have that nexus lets us stray out into situations such as this case, where there is a claim made that difficulties relating to zoning and building codes between Lakewood and the Hidden Village management has now ultimately morphed into a situation where Hidden Village alleges that it was unable to market its property to prospective buyers. That has no connection to the purposes of the Act. Ironically, without some kind of nexus requirement, I would submit to the Court also that persons... When you say nexus, you mean a predicate violation of the other statutes? A predicate violation, Your Honor. Or at least some connection to a person who has been denied housing. Okay. So why isn't that it? It's a connection? It doesn't mean you have to bring a claim under 3604? I'm not suggesting you do. I'm suggesting that there needs to be an underlying violation. Or at least some showing that some person has been denied fair housing opportunities. Why wouldn't it apply? They can be exercising their rights under 3604, trying to exercise them, but maybe they really don't have rights, but they're still trying, but then the city is threatening, interfering with that effort. Why wouldn't 3617 apply there? In this case, I don't think there was ever any evidence that the city did interfere, or at least any admissible evidence that the city interfered. That just takes you back to the underlying debate of whether there was race discrimination here and sifting through the record and running the inferences their way, right? I mean, think about it this way. Wouldn't you say if there was a material fact dispute about whether the city officials engaged in race discrimination related to this housing development, wouldn't that be enough under 3617 for prong one? I get your prong two argument that, well, this wasn't clearly established because there's a circuit split about whether you actually have to have a, say, 3604 claim. I get that prong two point. But you're arguing on both fronts, and I'm just saying assume for the sake of argument there's a material fact dispute about race discrimination related to the racial makeup of the people in this particular group and what was motivating the city officials when it came to their decisions to not let them locate there initially, to have all these surprise investigations, some of the statements by various individuals. If that all shows race discrimination, wouldn't that be a problem on prong one of 3617? I would agree with you, Your Honor, if there was any suggestion that that had the effect of interfering with the availability of housing. But it did not in this case. And I don't think there's any dispute about that. Well, it's true that they got to move in. But after that, well, first of all, that wasn't easy, number one. But number two, couldn't you read the record to say that they were trying to drive them out? There were, I believe, two inspections in the course of issuing the permits. I believe that there was another comprehensive inspection that occurred after an inspection at another premises, and there was time left in the day. The allegation is that, yes, that was retaliatory conduct directed at Hidden Village or YRP. But the fact of the matter is, it didn't result in a underlying violation of 3604. There, as I understand it, are two lines of cases. There is a line of cases that says that interference with the enjoyability of the property can be a denial of access. There is another line of cases that says the interference, if there is any, essentially has to arise to the level of a constructive eviction. Interfering, I'm quoting, the exercise enjoyment on account of his having exercised these rights. It doesn't prove you have those rights, that you're exercising them. I understand. That's what seems to suggest you can have a freestanding 3617 claim. There's no suggestion here that Hidden Village itself was exercising rights to housing. That they were renting to YRP. Well, they were trying to let these folks live where they thought the program would best be situated. 80% of the members of the program were African American. They were varying. Why isn't that on account of? I'm sorry. There were varying figures on the racial makeup of the YRP program. 80% was one of the figures mentioned. Well, isn't that the best one for them, and don't we have to rely on that evidence in summary judgment? I would suggest that's conceded at this point for purposes of this proceeding and the summary judgment motion, yes. What's your theory for 1981 and 82 in terms of third-party standing? In your supplemental brief in response to our question about Buchanan, you say, let me just see if I've got it, the city of Lakewood does not challenge plaintiff standing to bring the section 1981-82 or 83 claims in the incident appeal. I do not under—I'm sorry, your honor. To be clear, are you saying that all you're asking us to do is decide whether as a matter of law there was no race discrimination? Is that what you're saying? No, sir, your honor. I do not understand standing to be at issue before this court. This is an interlocutory appeal on issues of qualified immunity that arise from, number one, whether or not claims have been adequately made out on the merits, and, number two, on whether or not the law was clearly established. In terms of the section 1981 claim, there is no evidence in this case that there was an actual loss of a contract. I understand the contract section of 1981 to be what's at issue in this case. Hidden Village claimed that they had several inquiries from interested purchasers. This is exactly why third-party standing is one way of thinking about the case, and I thought it was the way Judge Pearson was thinking about the case. Standing was an issue on the summary judgment proceedings. I understand that it cannot be an issue here because it does not involve a matter of immunity or qualified immunity. And so, yes, standing was addressed, your honor, in the summary judgment motions below. I do not understand it to be an issue here. The matter on the merits is whether or not Hidden Village was ever denied the benefit of a contract, and, in fact, there was no contract actually formed, according to the record. There were several inquiries from interested purchasers. There were some letters of intent. There were never any contracts formed to purchase the property. And, in fact, Hidden Village claims that the purchasers went away for various— Your idea is the only people that can sue under 1981 and 1982 are either the program itself or the individuals participating in the program. That's not what I'm suggesting, your honor. What I'm suggesting is that there was not a contract at issue here as required under Section 1981. There wasn't a contract to rent? There was not a—but the contract that I understand to have been allegedly interfered with in this case was Hidden Village's ability to sell its property to interested purchasers. You don't think they're also saying it interfered with their lease to the program? I do not believe they are, and, in fact, the lease was not interfered with. YRP, its presence grew during the course of those events. And, again, it's been conceded by all concerned that YRP's—any fluctuations downward in YRP's presence, because it did fluctuate a little, any fluctuations downward were a result of YRP's funding issues. Before you sit down, what's your—do you have anything to add to your letter on the Buchanan point? That does seem a little problematic for your side, don't you think? I—again, your honor, no, I do not have anything to add on the Buchanan issue other than the fact that Buchanan was a seller who had a direct interest in a sales contract to a minority purchaser, and there was an ordinance that directly prohibited that purchaser from entering or living in the property. But, I mean, it doesn't make a difference whether it's an ordinance or officials undermining the right to contract, right? Correct, but the fact of the matter— But the ordinance doesn't do anything, because you can have city officials accomplishing the same thing, right? You can. Okay, so then that leads you to—it's the difference between a sales contract and a lease? No, your honor. The distinction that I see here is that there is no suggestion, however you view the city's actions, that they actually had the effect of depriving equal housing opportunities to any member of a protected class. Unlike in Buchanan, where there was an ordinance that specifically prohibited the minority purchaser from living in the neighborhood where the property was sold. And quite frankly, which would have prohibited the— Buchanan would have allowed a situation where the sale goes forward, and it's this white majority block that they were concerned about having a black individual homeowner. It would have been okay under Buchanan to let the sale go through, but then let the city officials harass the purchaser on that block until they left. I don't think that that would be proper conduct. Because that would be harassment based on racial discrimination, and here, isn't that their theory? They're trying to drive them out. They're harassing them based on their race. But as I understand the case law to date, that requires some showing that someone has been deprived of an equal housing opportunity, and that's not the case here. So you can harass as much as you want, as long as you're not successful in convincing them to move out, you have not acted unlawfully? Under the way the statutes are written, I understand that to be the case. I'm not suggesting that that would be admirable conduct. I'm not suggesting that that would be moral conduct. Well, that's a good answer to a loaded question. Well, why don't we—you'll get your full rebuttal. So why don't we hear from the other side? Thank you, Your Honor. May it please the Court. My name is Rich Haber, along with Avery Friedman. We represent Hidden Village LLC. If I could break down what the City of Lakewood is actually arguing here, they have four points legally on appeal. One is that there is a requirement for predicate violation of 3604 in order to maintain a 3617 claim, i.e., we have to establish that housing was made unavailable. That's point number one. Under the 1981 claim, they claim we have to show that there was a breach of a contract, i.e., that housing was made unavailable. Under 1982, they contend that we have to demonstrate that there was an adverse housing action, i.e., that housing was made unavailable. And then finally, under the 14th Amendment, their 1983 claim, they claim that we can't establish our claim because we have no racial identity. An argument that they did not make at the lower court. It's important to note what they argued in front of the lower court with respect to these four claims. Can I just add that the one that I'm a little skeptical of is I'm inclined to agree with your 3617 point about it being a freestanding claim. I'm a little skeptical of the prompt two point, I mean, that there's a split of authority. I thought that was a pretty classic setting for getting qualified immunity. Allow me to address that. My opponent actually misstated what the state of the law was at the time that these actions occurred. There was, they rely heavily on the AHL case, which was a 2009 case, that postdated their conduct. AHL relied upon the Halperin decision. The Halperin decision did not actually find that there isn't an individual 3617 claim. They questioned whether there would be a valid 3617 claim, but because neither party challenged the federal regulation, they let the 3617 claim go forward. The Cox case that AHL relied upon was decided in 2005, predating the acts in this case, but Cox did not involve a 3617 claim at all. If a split of authority develops and continues after the conduct, that helps the city officials. I realize that it's a ratchet that maybe seems a little unfair that it doesn't go the other direction, but the reality is if what they did is later vindicated by a growing, deepening split of authority, that helps them on the reasonableness point. I would agree with that. You can't freeze in time. I get why you're doing this because from their perspective, they're allowed to do that very thing, but this is qualified immunity. Yeah, but let me address that on two points because I agree with that general proposition, but I don't think that it's applicable here for two reasons. One is I don't think that you're getting a growing split. I think you're starting to see a coalescence of opinion that there are 3617 claims independent of a predicate 3604 claim. Second, but more importantly, there is no real reading of 3617 that would tell the city officials that it is okay to take these steps to drive YRP out of the city of Lakewood on the basis of their race and then to claim in litigation that we didn't know if we weren't successful that it was a violation of the law. Every act that these city officials took, construing the evidence in a light most favorable to us. I mean, you can spend your time on this one, but I think the point you're making with that is, of course, you would have a 3604 claim there, but that just wasn't what was brought. No, we brought a 3617 claim, but the acts of the city officials cannot be construed to be, they can't argue that they didn't believe that every predicate act they took towards this wasn't a violation of the Fair Housing Act. They just weren't successful in driving YRP out. They can't. I mean, forget the split in respect to 3617. I assume you'll agree with me that the Sixth Circuit law is pretty well established. If we have an issue about how to construe a statute and there's a split of authority among the circuit courts, the Sixth Circuit hasn't resolved it, and there's a split of authority among the circuit courts about what that statute means, that does help the city officials on prong two. I would agree that it would help them on prong two if there wasn't decisions out of the Northern District of Ohio and Southern District of Ohio already finding that you could maintain a 3617 claim without a predicate violation. You have the Loffman case, the Byrd case, both of which predate the conduct, and both were out of, one's out of the Northern District, one's out of the Southern District. The clearly established authority thing I don't think turns on district court decisions. At least, tell me the Sixth Circuit case that says that. Well, I don't know of a Sixth Circuit case that says it turns necessarily on, but if the Sixth Circuit hasn't had an opportunity to address it, that doesn't mean that the law isn't clearly established. You have a statute that is, I think, unambiguous. You have two district court decisions, one in the Northern District, one in the Southern District, that hold that you don't need a predicate violation. But I understand your point, but those arguments, I understand your point on 3617, but those arguments don't fly with their 1981, 1982, and 1983 claims either. The reason, the 1981 and 1982 claims are. I'm curious, why didn't the program sue? Why didn't you sue together or sue with the program and an individual that actually experienced the harassment? It's actually a very easy answer. The Lutheran ministry reached out to Lakewood at the very beginning because they wanted to have a good relationship. They wanted to be good citizens. They don't want to sue the city of Lakewood because they want to live peacefully within the city of Lakewood. And so they were uncomfortable. Now, interestingly, if Lutheran ministries had sued, then under the defendant's 1983 argument, because they lack a racial identity, they wouldn't have an equal protection claim under the 14th Amendment. But the reason they didn't is because they didn't want to be in an adversarial position with the city where they lived. I think the case law made it pretty easy for them to sue on behalf of their participants in the program, right? Well, not according to the racial identity argument. I agree with you. The case law establishes that the racial identity of a corporation doesn't prevent suing for equal protection violations, but that's the argument that they made. So the thought, the question to help us with is when you look at, you know, the normal rule is to have the person directly injured sue. So that's either the participants in the program or the program itself. Then the court says, and there's just cases all over the place that say, well, but, you know, depending on how the statute reads and depending on whether the individual is actually injured can sue, whether there's some impediment to suing, that often affects whether we're let, in this case the landlord, in other cases someone else do the suing. And your idea, well, they didn't want to worsen their relationship with the city by suing them. I guess that applies to everybody. I'm just not sure that counts as an impediment. If you look at this particular program, one of the reasons, if you look, there's the tenants are in the program for a month or two, and they might be subject to a single act of being cited for having no license on their bicycle, or they might have had their apartment inspected during this group session. But for the most part, each one of those individuals would probably not be able to identify a discrete set of facts that would support a fair housing violation as against them individually. Then you move to the YRP program, and the YRP program, their tenants are being harassed. They probably have a stronger claim globally because they can cobble together the harassment that has been directed at them by the police and the inspections. But the zoning issues were directed at Hidden Village, as an example. And the YRP program, because of their desire to live peacefully in the city of Lakewood, didn't find it was in their best interest to pursue it. The individual tenants are really not in a position to pursue it. Hidden Village is in a unique position because their relationship with the Lutheran ministries, with the YRP program, and with these tenants, is being directly impacted by the violations of the city of Lakewood directed at the YRP program. Is your hearing third-party standing in 8182, or is it direct injury? It's a direct injury to Hidden Village as a result of the discriminatory acts directed at... And is the direct injury the fact that it's more difficult to sell the building, the complex? That's actually just part of it. There is evidence that they had letters of intent that had been extended and then withdrawn when they disclosed the issues between the city of Lakewood and the YRP program. But there's also an increased cost of business. There's the retention of lawyers to deal with the zoning issue, to deal with the citation issues, to the stepped-up enforcement actions against Hidden Village has increased the cost of doing business. And ultimately, they're at risk of losing 40% of their program if these efforts continue to drive them out and they are successful. You're not claiming third-party standing? We are claiming third-party standing, but we are also seeking damages that we have sustained as a result of the actions of the city. But we are seeking to enforce the rights, the 14th Amendment rights of the tenants, the rights to be free from discrimination under 1981 and 1982 and under the Fair Housing Act. Are you enforcing your 14th Amendment rights? We are. Technically speaking, we are enforcing our 14th Amendment rights because we are entitled to equal protection in our efforts to contract with the YRP program and with the tenants indirectly. So do you think Buchanan applies to you or not? Because that's a direct injury to them. I do think Buchanan applies because it is a direct injury arising out of the right to contract with an African-American. But in addition to Buchanan, I think that Sullivan and Barrows also apply because you're talking about equal protection violations directed at African-Americans that result in direct harm to a party who had a contractual relationship with that third party. Now, Buchanan, you could argue that Buchanan's decision found an equal protection violation for Buchanan. You could also read Buchanan to say that he was enforcing the 14th Amendment rights of the person who he had the contract with. That particular person was using the ordinance as a defense and was not asserting their own 14th Amendment rights. And so what Buchanan stands for, in my estimation, is that you have the right to enforce those 14th Amendment rights, both on behalf of the individual, the African-American person who you had the contract with, but also because you're suffering damage as a result of that deprivation. With respect to the issues of adverse housing, breach of contract under 1981, the case law makes it very clear that those statutes are broader than just the narrow reading that the city of Lakewood has subscribed to them. For example, the 1981 statute actually defines what it means to make a contract. Under Section B of 1981, it defines making contract as enjoying the full benefits of that contract. So it is not simply that we need to show evidence that tenants were left and, as a result, breached contracts with Hidden Village. If we can demonstrate that those tenants lacked the enjoyment of that contract that they entered into, we have a 1981 violation. What they ask this court to do, in large part, is revisit the factual determinations that Judge Pearson made with respect to the discrimination itself. That's the reason for the 11-page statement of facts in their appellate brief to explain how all they were doing was attempting to enforce the zoning code and to exercise their police powers for the health, safety, and welfare of the citizens. But in reality, the evidence in this case is fairly profound when construed in an evidence in a light most favorable to us that discriminatory intent was at issue in this case. How do you read their supplemental brief about Buchanan where they say the city of Lakewood does not challenge plaintiff's standing to bring the Section 1981, 82, or 83 claims in the Instant Appeal that's somehow beyond our jurisdiction? And what I hear them to be saying is we're just challenging whether there was actually race discrimination. The predicate of all of that, how do you read that paragraph? I read it exactly the same way you do because I think it's actually consistent with the way they've postured their brief, which is they're challenging the finding of race discrimination, which I don't think would be appropriate here, as opposed to the legal claims that were asserted. By conceding that we have standing under 1981, 1982, and 1983, they are conceding that we have a claim and an injury and that we can proceed under 1981, 82, 83, and rather what they argue is that we didn't prove race discrimination. But construing the evidence in a light most favorable to us in this case, Judge Pearson already found that we did satisfy our burden in that regard. And we're allowed to just see whether there's a material fact dispute about whether race discrimination exists, right? Once you conclude there's a material fact dispute, then that should end your inquiry from a qualified immunity issue. On whether there's race discrimination? Correct. My time is almost up. If there are any other questions that I can answer, I'd be happy to do so. Well, next time it would make it easier if you had another plaintiff. Just from a work avoidance perspective. I would have been happy to have another plaintiff. Parenthetically, one of the individuals employed by YRP contacted me after all of this became public, after Judge Pearson's ruling, and I felt it would be a conflict to represent her at that time, and there were a lot of other complications in that. Okay. Thank you. Mr. Kleiner. Thank you, Your Honors. First of all, the racial identity issue that was brought up in the briefs, in fact, it is my position that that is an element of the plaintiff's case, and when challenged on summary judgment, the plaintiff under Celotex v. Catrett Corp. is required to show a material issue of fact on each and every element of their case, and that would include that they have a racial identity that puts them in a position to sue, not standing, but a person entitled to sue. In 1983, after Buchanan, that's not a problem. No, not in 1983. Not a problem under 3617. It is not. We are not challenging standing in this proceeding under 3617 either. And, Your Honor, the issue of qualified immunity, I do not intend to suggest to this court that the purpose of qualified immunity is to permit a city official to engage in any conduct they wish, no matter how discriminatory or no matter how rotten, as long as it doesn't drive a person out of their abode. But what qualified immunity is intended to do and what city officials need guidance on is the degree to which they are permitted to enforce zoning and building ordinances in buildings or in abodes that happen to have . . . In that case, I would say you're probably right. They have the right to say, oh, well, you know, this doesn't look residential. That strikes me as that probably would be legitimate to say that. But, hey, the zoning board said, sorry, you're wrong, and that did not end the case. They could have just stopped there. But if you read the evidence after that in their direction, it doesn't look like they were willing to go along with that. It looked like they were still scheming to come, you know, let's create a nuisance. Let's document everything. Gee, there are a lot of blacks that are in the program. That's hurtful. There were discussions among city officials that I believe were testified to about what should we do now. However, there were never any further actions taken on those discussions, at least on the zoning front. There was a subsequent building and zoning . . . There was nothing to do on the zoning front. Well, you lost and you didn't appeal, so that's the end of that. So why would you have these spot investigations? And why would, if 80% of the members of the program are African American and the other 20% are white, why would it only be the African Americans that complained about harassment? Why is it that none of the other participants in the program that were white also complained about police harassment? The only evidence of complaints by the tenants themselves is hearsay, Your Honor. It was related by Mark Brower and Candy Withers, who were administrators of the program who did not actually witness the events, who claimed to have heard complaints from their clients about harassment. How is it hearsay for an African American tenant to say, I was being harassed by the police? They're describing what they saw. But that is being offered through the testimony of Ms. Withers and Mr. Brower, who did not witness the events, and it's being offered to prove the truth of the matter asserted, that there was harassment of African American tenants, but it's not those tenants' testimony we have in this case. It's the testimony of Mr. Withers and Ms. Brower. All right. Thank you very much. Thank you, Your Honor. Any other questions? No, thank you. All right, thanks to both of you for your helpful legal briefs, oral arguments. It's a difficult case, and we'll work our way through it. So thanks very much. The case will be submitted.